FUJIWARA AND ROSENBAUM, LLLC

ELIZABETH JUBIN FUJIWARA 3558
JOSEPH T. ROSENBAUM 9205
1100 Alakea St., 20th Fl., Ste B
Honolulu, Hawaii 96813
Telephone: 808-203-5436

Attorneys for Plaintiff
KRISTILYN MAKEKAU

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| KRISTILYN MAKEKAU, | ) CIVIL NO. 21-00267 JMS-RT |
| --- | --- |
|  | ) (Other Civil Action) |
| Plaintiff, | ) |
|  | ) PLAINTIFF'S MEMORANDUM IN |
| vs. | ) OPPOSITION TO DEFENDANT |
|  | ) CHARTER COMMUNICATIONS, |
| CHARTER COMMUNICATIONS, | ) LLC'S MOTION FOR SUMMARY |
| LLC dba SPECTRUM, a foreign profit | ) JUDGMENT; CERTIFICATE OF |
| corporation; JOHN DOES 1-10; JANE | ) SERVICE |
| DOES 1-10; DOE CORPORATIONS | ) |
| 1-10; DOE PARTNERSHIPS 1-10; | ) |
| DOE UNINCORPORATED | ) |
| ORGANIZATIONS | ) Hearing |
| 1-10; and DOE GOVERNMENTAL | ) January 23, 2023 |
| AGENCIES 1-10, | ) Time: 10:00 a.m. |
|  | ) Judge: Hon. J. Michael Seabright |
| Defendants. | ) |
|  | ) Trial Date: March 14, 2023 |
|  | )  Judge: Hon. J. Michael Seabright |
|  | ) |
|  | ) |
|  | ) |
|  | ) |

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT CHARTER COMMUNICATIONS, LLC'S
MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Kristilyn Makekau [hereinafter referred to as "Ms. Makekau"], by and through her undersigned counsel, Joseph T. Rosenbaum and Elizabeth Jubin Fujiwara of the law firm Fujiwara and Rosenbaum, LLLC, hereby **opposes** Defendant Charter Communications, LLC's [hereinafter referred to as "Defendant" and/or "Charter"] Motion for Summary Judgment [hereinafter referred to as "Defs. Motion"].

## II.  PERTINENT FACTS

Ms. Makekau was hired by Charter's predecessor on or about January 3, 2011. Declaration of Kristilyn Makekau ("Makekau Decl.") at ¶ 4. Ms. Makekau was hired and worked for Charter's predecessor and Charter as a customer service representative ("CSR"). *Id*. at ¶ 5. As a CSR, Ms. Makekau essential job duties were to sit at her desk, take calls and answer emails to try to sell Charter's services to current and potential customers. *Id*. at ¶ 6. For approximately seven years, Ms. Makekau performed her essential job duties without any substantial issues. Ms. Makekau's job did not require any heavy lifting or other physically taxing manual labor. *Id*. at ¶ 7.

For the entirety of her employment with Charter, Ms. Makekau was a clinically

–3–

obese woman who had a long history of diabetes and hypertension which resulted in physical limitations including, but not limited to, physical limitations related to her diabetes-related neuropathy in her feet and hands. *Id.* at ¶ 8. Ms. Makekau's diabetes and related neuropathy limits her ability to walk, talk, see, work and generally function in her day-to-day activities. *Id.* at ¶ 9.

Charter's management was directly aware of Ms. Makekau's obesity, diabetes and her diabetes-related neuropathy including Charter Manager Ms. Robin Tokunaga and Human Resource's Manager Ardis Murayama based on communications Ms. Makekau had with her managers and Ms. Makekau's need to address her diabetes in the workplace when her sugar levels were fluctuating. *Id.* at ¶ 10. Ms. Makekau would have to be assisted by her managers/supervisors, Melissa Ah Yat (team lead), Prudence Quebatay (team lead), Summer Fujioka, and Leeann Yamashiro with candy and/or sugary drinks when she was having diabetic episodes in the workplace. *Id.* at ¶ 11. Based on her size, it is obvious that Ms. Makekau is obese and she repeatedly discussed her diabetes and her very painful diabetes-related neuropathy in her feet with the aforementioned managers at Charter. They were all well-aware of Ms. Makekau's disabilities. *Id.* at ¶ 12.

In or about January 2018, Ms. Makekau was told that beginning in February 2018 she would be required to park at an offsite parking lot and would then need to catch a shuttle to the office provided by the company. *Id.* at ¶ 13. Prior to this coming

change to the parking area for employees, Ms. Makekau parked approximately 12 feet from her office building door and would then take the elevator up to her work area. With neuropathy in her feet, each step is like walking on needles. *Id*. at ¶ 14. As evidenced by the incident on February 5, 2018, discussed more below, Ms. Makekau would have to walk a little less than 50 feet to the shuttle bus from where she would have to park at the new offsite lot. Then Ms. Makekau would have to walk about one hundred and eighty (180) feet from the road where the shuttle drop-off was to the office building. *Id*. at ¶ 15.

Reluctant to do this due to her disability and the severe pins and needles pain in her feet from the neuropathy, Ms. Makekau spoke with supervisor/manager, Robin Tokunaga, on or about January 30, 2018, and asked for a reasonable accommodation in being able to park on site at the office due to Ms. Makekau's obesity, diabetes and diabetes-related neuropathy in her feet. *Id*. at ¶ 16. Ms. Tokunaga responded that Ms. Makekau had to park at the offsite parking lot and that they couldn't make any accommodations for her or they would have to accommodate everyone else. *Id*. at ¶ 17. Ms. Tokunaga flatly denied Ms. Makekau's request for an accommodation in being able to park in the parking lot close to the building she worked in as she previously had been doing. *Id*. at ¶ 18. In flatly denying Ms. Makekau's request for an accommodation, Ms. Tokunaga did not offer or suggest any alternatives to accommodate Ms. Makekau's disability. *Id*. at ¶ 19. Ms. Makekau asked Ms.

–5–

Tokunaga if there was anything she could do or if she could get a note from her doctor to be granted the requested accommodation. Ms. Tokunaga told Ms. Makekau, "No" and that it would not make any difference. *Id.* at ¶ 20.

On or about February 1 and 2, 2018, Ms. Makekau got rides to the office and didn't have to use the shuttle from the off-site parking lot. *Id.* at ¶ 21.

On February 5, 2018, Ms. Makekau parked at the offsite parking lot and was injured getting onto the shuttle. *Id.* at ¶ 22. Ms. Makekau hurt her neck, shoulder, back and knee trying to pull herself into the shuttle from the off-site parking lot. *Id.* at ¶ 23. Ms. Makekau reported her injuries to supervisor, Lark Klimek. *Id.* at ¶ 24. Ms. Klimek had Ms. Makekau speak with a nurse over the phone who then directed Ms. Makekau to go to a workman's compensation doctor. *Id.* at ¶ 25.

After that phone call, Ms. Makekau went straight to the Workstar Injury Recovery Center. *Id.* at ¶ 26. A Workstar Doctor examined Ms. Makekau's injuries and she was placed off duty. *Id.* at ¶ 27. Ms. Makekau was on workman's compensation from February 5, 2018 on. *Id.* at ¶ 28.

On July 5, 2018, Ms. Makekau was issued a letter from Charter's Human Resources Director, Ardis Murayama, stating that Ms. Makekau would be terminated by Charter if she did not return to work by August 5, 2018. *Id.* at ¶ 29; *see* Exhibit 1 attached to Ms. Makekau Concise Statement of Facts ("CSF"). On the same date, Ms. Makekau was approved for her MRI related to her work-injuries. *Id.* Ms. Makekau

–6–

was only provided one month's notice of Charter's inflexible leave of absence policy. Makekau Decl. at ¶ 30. This left Ms. Makekau with very limited time to try to get cleared to return to work considering she had just gotten scheduled for the MRI to determine the course of treatment needed. *Id*. at ¶ 31.

On July 28, 2018, Ms. Makekau had a consultation with Surgeon Dr. Kan, who determined she needed surgery. *Id*. at ¶ 32. However, due to her underlying disability and then the issues surrounding care related to going in for treatment during COVID-19, Ms. Makekau is still waiting for medical clearance to have the needed surgery. *Id*. at ¶ 33.

Unbeknownst to Ms. Makekau prior to the Murayama July 5, 2018 letter, Charter had a 6-month deadline to return to work policy from the time of Ms. Makekau's leave. *Id*. at ¶ 34. Charter's inflexible leave return policy required Ms. Makekau to return to work on or before been August 5, 2018. *Id*. at ¶ 35.

The key issues with Ms. Makekau's ability to perform her essential job functions without accommodations after the injury was due to excruciating pain of sitting for long periods of time and needing to take breaks and stand up and/or sit down periodically. *Id*. at ¶ 36.

On August 3, 2018, via her union representative Prudence Quebatay, Ms. Makekau submitted a request for an extension of her leave as an accommodation for her disability. *Id*. at ¶ 37; *see* attached to Ms. Makekau's CSF as Exhibit 2. Charter

–7–

flatly denied Ms. Makekau's request for an extension of her leave. Makekau Decl. at ¶ 38. Charter did not engage Ms. Makekau in any interactive process to see if an accommodation could be found for her. *Id*. at ¶ 39.

Ms. Makekau would have done whatever was necessary to return to work and not be terminated including, but not limited to, take breaks to stand up periodically from her desk, return on limited duty or for limited hours, take an alternative available job placement, work from home, use a wireless head set to talk on the phone as she would stand up and sit down periodically, use a different chair (other of Ms. Makekau's coworkers were provided such chairs), use a raised desk (other of Ms. Makekau's coworkers were provided raised desks), sort mail, or do anything to return to work. *Id*. at ¶ 40. Ms. Makekau was never given any chance to discuss these possible accommodation options with Charter management as her request for an accommodation was flatly denied without any back and forth with management to see if a reasonable accommodation could be found for her to return to work. *Id*. at ¶ 41.

On or about August 6, 2018, Ms. Makekau received a certified letter in the mail from Ardis Murayama stating Ms. Makekau had been terminated because she had not returned to full duty within 6 months from the time she was placed on leave. *Id*. at ¶ 42; *see* attached to Ms. Makekau's CSF as Exhibit 3.

Ms. Makekau was then placed on a recall list for the next 6 months which would allow her to return without losing her seniority if she was released for full duty

–8–

and there was a position available. *Id*. at ¶ 43.

On or about January 24, 2019, prior to the end of Ms. Makekau's placement on the 6 month recall list she submitted to Charter, via her union representative Prudence Quebatay, a limited return to work ("light duty") form from her doctor requesting accommodation for Ms. Makekau to return to work. *Id*. at ¶ 44; *see* attached to Ms. Makekau's CSF as Exhibit 4. Ms. Makekua's request for accommodation was flatly denied because Charter would not allow Ms. Makekau to return on light duty. *Id*. at ¶ 45. No "interactive process" took place. *Id*.

Upon approaching the 6-month deadline of the recall list, on or about January 31, 2019, Ms. Makekau submitted, via her union representative Prudence Quebatay, her 2nd request for an extension of her leave and the recall list policy which was also flatly denied without any interactive process to see if an accommodation could be found. *Id*. at ¶ 46; *see* attached to Ms. Makekau's CSF as Exhibit 5.

Ms. Makekau filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about April 25, 2019. Makekau Decl. at ¶ 47. Ms. Makekau was informed by the EEOC investigator that there were a group of former Charter employees who had all filed Charges of Discrimination against Charter for Americans with Disabilities Act violations due to its inflexible disability leave policy and Charter not engagement their employees in the required "interactive process" to see if any reasonable accommodation could be had. *Id*. at ¶ 48. These

other employees EEOC Charges settled via a group settlement. *Id*. at ¶ 49. Ms. Makekau received her "Right to Sue letter" from the EEOC on or about March 12, 2021. *Id*. at ¶ 50.

### III.     LEGAL STANDARD:  No Room for Controversy:

Summary judgment is a drastic remedy. Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is **required to draw all inferences in a light most favorable to the non-moving party**." *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997). (Emphasis added).

The **Ninth Circuit Court of Appeals** is generally reluctant to approve a summary judgment in a case in which the **motivation or intent of a party is placed at issue, especially in employment rights cases**. *See, e.g., Perez v.Curcio*, 841 F.2d 255, 258 (9th Cir. 1988)(emphasis added); *Yartzoff v. Thomas,* 809 F.2d 1371, 1377 (9th Cir. 1987). Consequently, **as the requisite discriminatory intent is inherently a factual question, and is usually proven by inference and circumstantial evidence, it is rare to grant summary judgment in favor of a defendant in a discrimination case.** *See Lam v. University of Hawaii*, 40 F.3d 1551 (9th Cir.1994)

(emphasis added). On summary judgment, the existence of a discriminatory motive for the employment decision will generally be the principal question.

## IV. ARGUMENT

### A. Ms. Makekau Can Establish That She Was Discriminated Against Under the Americans with Disabilities Act When She Was Denied a Reasonable Accommodation and Terminated.

The Americans with Disabilities Act ("ADA") provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability...." 42 U.S.C. § 12112(a). An individual is a "qualified individual with a disability" if she can perform the essential functions of the position that she holds or desires, ***with or without reasonable accommodation.*** 42 U.S.C. § 12111(8)(emphasis added); *Kennedy v. Applause,* 90 F.3d 1477, 1481 (9th Cir.1996); *see also Cripe v. City of San Jose,* 261 F.3d 877, 884 (9th Cir.2001). Thus, to state a prima facie case under the ADA, Ms. Makekau must show that (1) she is a disabled person within the meaning of the ADA; (2) she is a qualified individual, meaning she can perform the essential functions of her job; and (3) she was terminated because of her disability. *Nunes v. Wal–Mart Stores,* Inc.,164 F.3d 1243, 1246 (9th Cir. 1999). It is an act of discrimination to fail reasonably to accommodate a qualified employee with a disability unless the employer can show that such an accommodation would impose an undue hardship. *See* 42 U.S.C. § 12112(b)(5)(A); *see also McAlindin v. County of San Diego,* 192 F.3d 1226, 1236 (9th Cir.1999), *amended by,* 201 F.3d 1211 (9th

Cir.), *cert. denied,* 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000); *Braunling v. Countrywide Home* 1253*1253 *Loans Inc.,* 220 F.3d 1154, 1157 (9th Cir. 2000).

### 1. Plaintiff Can Establish That She Was Disabled

The ADA defines "disability," in pertinent part, as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2). Based on Defs. Motion at pg. 1, Charter concedes that Ms. Makekau is disabled. As such, the issue of whether Ms. Makekau is a disabled woman under the ADA has not been opposed by Charter, is essentially admitted and will not be taken up herein.

### 2. Ms. Makekau Can Demonstrate That She Was a Qualified Individual as She Had Previously and Could Continue to Perform the Essential Functions of Her Job with a Reasonable Accommodation

Plaintiff's essential job functions were to sit at a desk, talk on the phone, exchange emails and make sales for Charter. Makekua Decl. at ¶ 6. For approximately 7 years, Ms. Makekau had no issues performing her essential job functions even though she had the same disabilities. *Id*. at ¶ 7. Moreover, had Ms. Makekau been engaged by Charter in the interactive process to find an accommodation she could have been able to return to work with periodic breaks to stand up and/or sit down, take breaks to stand up periodically from her desk, return on limited duty or for limited hours, take an alternative available job placement, work

from home, use a head set to talk on the phone as she would stand up and sit down periodically, use a stand up desk, use a special chair, sort mail, or do anything else to return to work. *Id*. at 40. Charter wholly failed in its legal responsibility to participate in the interactive process required by the ADA to see if a reasonable accommodation could be found.

### 3. Charter Failed to Engage in the "Interactive Process" *In Good Faith* to Find a Reasonable Accommodation for Plaintiff

Under the framework of the ADA an employer must reasonably accommodate the employee's disability. 29 C.F.R. § 1630.9 (2006). The Ninth Circuit has made clear that the employer must affirmatively engage in the "interactive process in order to identify, if possible, a reasonable accommodation that would permit [the employee] to retain [her] employment." *Dark v. Curry County,* 451 F.3d 1078, 1088 (9th Cir., 2006); *see also Morton v. United Parcel Service*, 272 F.3d 1249 (9th Cir. 2002), (making clear that summary judgment is available only where there is no genuine dispute that the employer has engaged in the interactive process ***in good faith)***.(Emphasis added).

The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a "qualified individual," the employer receives adequate notice, and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business. 42 U.S.C. § 12112(b)(5)(A) ("[T]he term `discriminate against a qualified individual on the basis

of disability' includes — not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]"). The statute itself places on the employer the burden to demonstrate an undue hardship. *Id.*

The Ninth Circuit has held that notifying an employer of a need for an accommodation triggers a duty to engage in an "interactive process" through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee. *See Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1111-16 (9th Cir. 2000) (en banc), *vacated on other grounds sub nom., US Airways, Inc. v. Barnett,* 535 U.S. 391, 406, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002). In *Barnett,* the Ninth Circuit held that if an employer receives notice and fails to engage in the interactive process in good faith, the employer will face liability "*if a reasonable accommodation would have been possible.*" Barnett, 228 F.3d at 1116 (emphasis added).

Recognizing the importance of the interactive process, the Ninth Circuit also held that if an employer fails to engage in good faith in the interactive process, the burden at the summary-judgment phase shifts to the employer to prove the

unavailability of a reasonable accommodation. *See Morton v. United Parcel Serv., Inc.,* 272 F.3d 1249, 1256 (9th Cir. 2001), *overruled on other grounds, Bates v. United Parcel Serv., Inc.,* 511 F.3d 974, 995 (9th Cir. 2007) (en banc); *Barnett,* 228 F.3d at 1116 ("We hold that employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible. We further hold that an employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process."). The rationale for shifting this burden arises from EEOC regulations and the ADA's legislative history that characterize the interactive process as at the heart of the accommodation process. *See Barnett,* 228 F.3d at 1110-16.

In the binding case *Morton* out of the 9th Circuit, in which plaintiff Morton requested an accommodation and the defendant UPS did not engage Morton in the interactive process to see if a reasonable accommodation existed, the 9th Circuit held that summary judgment in favor of the defendant UPS on plaintiff Morton's ADA claim was improper. The *Morton* Court explains:

> Those circumstances, most notably, include the fact that UPS, by its own admission, did not participate with the plaintiff in the interactive process that the statute contemplates. *See Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1113-14 (9th Cir.2000) (en banc), *cert. granted,* ___ U.S. ___, 121 S.Ct. 1600, 149 L.Ed.2d 467 (2001) (granting certiorari on an unrelated issue). *Barnett* holds that "employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Id.* at 1116; *see also id.* ("[S]ummary judgment is available only where there is no genuine dispute that

the employer has engaged in the interactive process in good faith.") It is the employer's responsibility, through participation in the interactive process, to assist in identifying possible accommodations. *Id.* at 1115. Here, UPS does not argue that it *did* engage in good faith in the interactive process. The question whether this failure should be excused because there would in any event have been no reasonable accommodation available is one as to which the employer, not the employee, should bear the burden of persuasion throughout the litigation. *See id.* at 1115-16 ("[T]he jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations.")
*Id*. at 1256.

The situation in the present matter is very similar to *Morton* as Charter did not engage Ms. Makekau in the ADA-required interactive process to see if an accommodation could be found before terminating her. Ms. Makekau requested an accommodation in an extension of leave from Charter. At that point Charter had a duty to engage Ms. Makekau in the "interactive process" to determine if a reasonable accommodation could be found to get Ms. Makekau back to work. Charter had the duty to suggest other accommodations if extended leave would be an undue hardship for them or at least show why it would be a hardship for a very wealth, nationwide corporation that is publicly traded. However, Charter simply rejected Ms. Makekau's request for an accommodation, failed to participate in the ADA-required "interactive process" and then terminated Ms. Makekau when she did not return back to work. This is exactly what the ADA forbids.

The facts herein show Charter's intention to not act in good faith to reasonably accommodate Ms. Makekau. Ms. Makekau no less than four (4) times requested reasonable accommodations and was each time flatly denied without any "interactive process" or efforts by Charter to see if any accommodations could be found for her to return to work.

Ms. Makekau enjoyed working at Charter and needed her job. Makekau Decl. at ¶ 51 and could have returned to work if she would have been provided any one of the simple accommodations listed above that would allowed her to return to work and

be able to perform her essential job functions with said accommodation. Makekau Decl. at ¶ 52. Ms. Makekau and Charter could have come up with many unknown reasonable accommodation options, including but not limited to: periodic breaks to stand up and/or sit down, take breaks to stand up periodically from her desk, return on limited duty or for limited hours, take an alternative available job placement, work from home, use a head set to talk on the phone as she would stand up and sit down periodically, sort mail, or do anything else to return to work, or any other creative solution to get Plaintiff back to work. *Id.* at 40. Instead, Charter chose to completely deny Ms. Makekau's request for an accommodation thereby foreclosing the possibility of any "unmentioned possible accommodations". *Morton* at 1256. To note: The ADA specifically contemplates "reassignment to a vacant position" as a possible accommodation. 42 U.S.C. § 12111(9)(b). Ms. Makekau's ability to return to work with a reasonable accommodation is reflected in her limited return to work doctor's note that was provided to Charter before her 6-month recall list deadline came and past. Makekau Decl. at 44; *see* attached to Ms. Makekau's CSF as Exhibit 4.

      Contrary to Charter's assertion, Ms. Makekau is not arguing that an indefinite leave period would be a reasonable accommodation. Ms. Makekau simply argues that after requesting additional leave beyond the Charter 6 month leave policy, Charter had a duty to engage Ms. Makekau in discussions to see if extra leave would be an undue hardship on Charter or whether there was another reasonable accommodation that could have worked to allow Ms. Makekau to maintain her employment and return to work. Furthermore, Ms. Makekau was made aware that another Charter employee was granted any extension of leave past the Charter 6-month leave policy. Makekau Decl. at 53. It is abundantly clear from a total lack of argument as to the undue hardship by Charter, that it could have extended Ms. Makekau's leave as a reasonable accommodation. The burden is on the employer to demonstrate that an undue hardship would result. *Summers v. A. Teichert & Sons, Inc.,* 127 F.3d 1150, 1153 (9th

Cir. 1997). Further, the Ninth Circuit has also made clear that the undue hardship analysis is a "fact-intensive inquiry, rarely suitable for resolution on summary judgment." *Morton* at 1256-1257.

Even more glaring is Charter's lack of a declaration attached to Defs. Motion from any one of its employees, let alone members of management, that an extension of leave would be an undue hardship or that it engaged Ms. Makekau in the legally required "interactive process" to find an accommodation. This omission can only reflect the fact that no efforts were made by Charter to engage in the interactive process to find an accommodation for Ms. Makekau to get her back to work. This is even though all Ms. Makekau would have need was periodic breaks and to be able to stand and sit while on the phone or computer.

### 4. Ms. Makekau's First Request for An Accommodation is Not Time-Barred

Charter argues that because Ms. Makekau first asked for and was denied an accommodation regarding parking on January 30, 2018, this claim is not actionable as time-barred. Ms. Makekau filed her Charge of Discrimination with the EEOC on April 25, 2019. Ms. Makekau argues that although 300 days past before Ms. Makekau filed for the denial of her parking accommodation, it should still be allowed under the "continuing violation" theory.

Generally, under the continuing violations doctrine, discriminatory conduct contributing to a hostile work environment claim, but falling outside of the statutory time period for filing a claim, may be considered by the Court for purposes of determining liability. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002).

In determining whether a claim is timely, there is a distinction between discrete acts of discrimination or retaliation, and hostile work environment claims. ***A discrete act consists of an unlawful practice that "occurred" on the day it "happened," which includes, for example, "termination, failure to promote, denial of transfer, or refusal to hire***." Id. at 114. In comparison, hostile work environment claims "are based on the cumulative effect of individual acts," "occur [] over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id*. (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Thus, "provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability .... the employee need only file a charge within [the relevant time period] of any act that is part of the hostile work environment." *Id*. at 117–18.

Further, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan* at 113; see also *Porter v. California Dep't of Corrections*, 419 F.3d 885, 893 (9th Cir.2004). ***In determining whether particular events are part of the same actionable hostile work environment claim, the Court considers "whether they were sufficiently severe or pervasive, and whether the earlier and later events amounted to the same type of employment actions, occurred relatively frequently, [or] were perpetrated by the***

*same managers.*" *Porter*, 419 F.3d at 893 (quoting *Morgan*, 536 U.S. at 116) (emphasis added).

Nonetheless, while a time-barred claim has no "present legal consequence[ ], ... [i]t may still constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); see also *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Here, the claim related to the denial of an accommodation in January 2018 as pled in Ms. Makekau's Charge of Discrimination filed on April 25, 2019, should not be time-barred as 1) the denial of the reasonable accommodation was severe and resulted in her injuries, 2) the denial of the accommodation is the same type of recurring disability discrimination employment action that was timely filed with the EEOC (denial of reasonable accommodations), 3) this happened relatively frequently and 4) it's done by the same managers (Murayama and Tokunaga). Ms. Makekau claims are based on the cumulative effect of individual acts that occurred over about a year's time.

If the court determines that Ms. Makekau's claim is time-barred, the Court should recognize that his claims are evidence that may still constitute relevant background information to Ms. Makekau's's disability discrimination claim as stated in her First Amended Complaint. See *infra United Air Lines, Inc. v. Evans*, 431 U.S.

553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (while a time-barred claim has no "present legal consequence[ ], ... [i]t may still constitute relevant background evidence in a proceeding in which the status of a current practice is at issue."; see also *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Evidence of time-barred acts may be "offered for its probative value in assessing whether the employer's justifications for its present conduct lack credibility" and may also serve "as indirect proof of the employer's intent to discriminate." *Bagley v. Bel-Aire Mech. Inc.*, 647 Fed.Appx. 797, 799–800 (9th Cir. 2016). (citing *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir.2002).

## V.  CONCLUSION

For all of the reasons set forth herein and supported by the attached declarations and exhibits, as well as all of the records and files herein, this Honorable Court must deny Defs. Motion.

DATED: Honolulu, Hawaii, January 2, 2023

FUJIWARA AND ROSENBAUM, LLLC

/s/ Joseph T. Rosenbaum
ELIZABETH JUBIN FUJIWARA
JOSEPH T. ROSENBAUM

Attorneys for Plaintiff
KRISTILYN MAKEKAU